UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-20346-CR-JEM

**UNITED STATES OF AMERICA,**

vs.

**MARCOS TOMAS PEREZ,**

    **Defendant.**

    _____/

## UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM

The United States of America respectfully submits this sentencing memorandum for the Court's consideration and responds to Defendant's Sentencing Memorandum and Request for Downward Variance and/or Departure ([ECF No. 24]).

Defendant Marcos Tomas Perez ("Defendant" or "Perez") is responsible for what sports journalists have described as the largest sports memorabilia theft in United States history. Perez carried out this scheme by using his position with the City of Miami Police Department, where he served as a gameday security detailee assigned to the Miami Heat ("Heat") to secure permanent employment with the team as a staffed security employee with both the Heat and, later, the National Basketball Association ("NBA").

Perez used these trusted roles to obtain unauthorized access to a secured supply closet that contained hundreds of historical and high-value memorabilia items earmarked for a future Miami Heat Museum. Over the course of several months, Perez systematically stole more than 500 pieces of memorabilia from this secured area. He then sold the stolen items over a period of four years using various online platforms.

Law enforcement has identified approximately $1.8 million in proceeds Perez obtained from the sale of approximately 200 stolen items. In many cases, Perez sold the memorabilia for

1

only a fraction of their true value. That disparity is starkly illustrated by the fact that six of the items later resold at separate Sotheby's auctions for a combined $4.8 million. One of those items, a LeBron James game-worn jersey from Game 7 of the 2013 NBA Finals, sold for $3.68 million alone.

Perez funneled the illicit proceeds into a bank account held in the name of his business, South Florida Sports Authenticators, and used the funds to purchase additional sports memorabilia and for his personal investments. His conduct not only breached the trust placed in him by the Heat and the NBA but also caused significant financial and cultural harm to the victim organization and to the public.

Given the magnitude of Perez's criminal conduct, his prolonged abuse of positions of trust with the Heat and the NBA, and the substantial financial harm caused, a downward variance or departure is wholly unwarranted. A sentence of 36 months' imprisonment appropriately reflects the seriousness of the offense, promotes respect for the law, protects the public from further crimes, and provides adequate deterrence to others who may be tempted to exploit institutional trust for personal gain.

## SENTENCING PRINCIPLES

## 18 U.S.C. § 3553(a)

After *United States v. Booker*, 543 U.S. 220 (2005), a sentencing court need only consider the factors in 18 U.S.C. § 3553(a) and determine a reasonable sentence. *United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005). We address the relevant factors below. While the Court must consider all the relevant factors, it "need only acknowledge that it considered [them], and need not discuss each of these factors in either the sentencing hearing or in the sentencing order." *United*

*States v. Amedeo*, 487 F.3d 823, 833 (11th Cir. 2007). The Court may give greater weight to some factors than others. *See United States v. Shaw*, 560 F.3d 1230, 1238 (11th Cir. 2009).

The Court may also consider requests for variances and departures. The Supreme Court has held that variances from the advisory guideline range may, in some instances, be based on the sentencing judge's disagreement with whether a guideline properly reflects the § 3553(a) factors. *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015) (citing *Kimbrough v. United States*, 552 U.S. 85, 105–09 (2007)). However, Amendment 836, effective November 1, 2025, removed certain departures and policy statements relating to specific personal characteristics, including §5H1.6 (Family Ties and Responsibilities). (See USSG App. C, amendment 836). The United States Sentencing Commission statement of reasons reflect that they sought to make these changes to better align the requirements placed on the court and acknowledge the growing shift away from the use of departures provided for within the Guidelines Manual in the wake of *United States v. Booker* and subsequent decisions.

    **A.**    **The nature and circumstances of the offenses. See 18 U.S.C. § 3553(a)(1).**

As detailed above and in ECF No. 24, Perez stole hundreds of items of Miami Heat memorabilia during his employment with the franchise and gradually sold these items over a four-year period. Perez, who most recently worked as a security employee for the NBA, first began his professional relationship with the Miami Heat in 2016, following a 25-year career with the City of Miami Police Department. During his police tenure, he served as a gameday security detailee for the Heat, a role that allowed him to build familiarity and trust with an organization known for their strong internal culture. Approximately five years into his employment with the Heat, Perez abused this position by accessing a secured equipment closet and beginning to steal memorabilia from the organization. The text messages below reflect Perez's first entry into that equipment room in July

2021, when he accompanied a Heat equipment employee to carry items into the space. Following that initial access, the following text message exchange occurred, demonstrating the inception of Perez's scheme:





At that point, Perez made the deliberate decision to steal the jerseys and sell them for personal profit. Over the following months, Perez claims that he repeatedly accessed the equipment room by creating pretexts to separate himself from his coworkers, obtaining the storage closet key, propping the door open, and taking memorabilia after others had left the area.

Within the first two months after stealing the initial jerseys, Perez and his coconspirator engaged an attorney to prepare four written contracts to facilitate the sale of eight stolen jerseys to a buyer in California. Those eight jerseys were sold for a combined contract price of $616,861.59 across four contracts. Among the items included in those sales were game-worn jerseys from the NBA Finals belonging to LeBron James, Dwyane Wade, and Chris Bosh, as well as a game-worn Shaquille O'Neal jersey.

After completing the sale of these items, Perez marketed the remaining stolen memorabilia himself, through various online platforms, including OfferUp, eBay, and Instagram. He negotiated prices directly with potential buyers and promptly blocked any user who questioned the legitimacy of the items or suggested that the jerseys might have been stolen.

The Defendant also created an iCloud link to a document containing a Microsoft Excel spreadsheet cataloging all jerseys in his possession that were available for sale. The spreadsheet included Perez's self-assigned inventory numbers, the player's name, jersey color, dates worn, estimated value, opposing team on the date worn, player statistics for the relevant games, and the specific locations where Perez was personally storing each item, among other details. Perez engaged in a process called photo matching to assure the authenticity of the items to potential buyers and confirm the game where the jersey was worn. This process also increases the value of the jerseys.

Perez continued this operation from fall 2021 through late 2024. By that point, law enforcement had become aware of Perez's activities and initiated contact with him. Investigators negotiated three controlled purchases of stolen memorabilia from Perez, all of which were shipped across state lines. On April 3, 2025, law enforcement executed a search warrant at Perez's residence and seized more than 400 Miami Heat memorabilia items still in his possession. Perez subsequently provided a full confession detailing the scheme.

The investigation also revealed how Perez used the proceeds of his theft. He invested approximately $360,000 in a real-estate fund, reinvested an additional $45,000 to $50,000 in memorabilia purchases at auction, wrote approximately $25,000 in checks to himself and immediate family members, and spent the remainder on living expenses and credit-card payments. Notably, the record contains no evidence that the Defendant applied any of his ill-gotten proceeds toward the health care expenses that he now relies upon to justify a downward variance.

These facts demonstrate the extensive, deliberate, and sophisticated nature of the Defendant's multi-year scheme to steal and sell millions of dollars' worth of jerseys and memorabilia from his employer. Equally significant is the abuse of the victim's trust and the

enduring impact on the victim. The Heat have lost irreplaceable pieces of their franchise history, items intended for a future team museum, that they are unlikely ever to recover all at the hands of a trusted employee. Perez sold certain memorabilia to buyers in China, while other items have already changed hands at least once, if not multiple times, making the task of locating and recovering the hundreds of stolen items impracticable. The LeBron James game-worn NBA Finals jersey alone resold overseas for more than $3 million, further complicating any potential recovery and underscoring the magnitude of the harm inflicted.

In light of the complexity of the scheme, the substantial financial and historical losses suffered by the victim, and the need to promote respect for the law and provide just punishment, a sentence of 36 months' imprisonment is both appropriate and necessary under 18 U.S.C. § 3553(a).

### B. The history and characteristics of the Defendant. See 18 U.S.C. § 3553(a)(1).

While the Defendant has no prior criminal history and boasts his family, community, and church involvement as a basis for a lower sentence, the Court should note that the Sentencing Guidelines do not authorize special sentencing discounts based on a defendant's economic or social status. As the Eleventh Circuit has made clear, "[b]usiness criminals are not to be treated more leniently than members of the 'criminal class' just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity." *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013). Indeed, "[c]riminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime." *Id.* at 1329–30 (quoting *United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999)).

By his own account, the Defendant had a lengthy law enforcement career, admirable post-retirement employment, and a loving and successful family. He owned his own home and had

7

extensive savings. He was not without the necessities in life. Yet despite being fortunate enough to enjoy a stable lifestyle, he still decided to steal property from his employer, fueled only by greed.

Moreover, the Defendant's lack of criminal history is already accounted for in his Criminal History Category I and his zero-point offender status, both of which resulted in a lower guideline range than would apply if he had a prior record. Courts in this Circuit have consistently rejected the notion that a lack of prior convictions warrants further downward variance or departure. See *United States v. Howard*, 28 F.4th 180, 223 (11th Cir. 2022); see also *United States v. Martin*, 455 F.3d 1227, 1239 (11th Cir. 2006) ("While the district court emphasized [the defendant]'s lack of a criminal record and viewed his fraudulent conduct as an 'aberration' in his otherwise outstanding life, [the defendant]'s criminal history category of I already takes into account his lack of a criminal record."). Thus, while the Defendant's lack of criminal history is not irrelevant, the Court should not give this factor more weight than the guidelines already provide, nor should it view it as a compelling basis for leniency in this case.

    **C.**    **The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; general deterrence; and specific deterrence. See 18 U.S.C. § 3553(a)(2)(A), (B), (C).**

The Eleventh Circuit has repeatedly emphasized the critical importance of general deterrence in white-collar cases, "where the motivation is greed." *United States v. Hayes*, 762 F.3d 1300, 1308–09 (11th Cir. 2014). See also *United States v. Kuhlman*, 711 F.3d 1321, 1328–29 (11th Cir. 2013) (vacating, as substantively unreasonable, a noncustodial sentence representing a 57-month downward variance in a $3 million health-care-fraud prosecution, noting that "[s]uch a sentence fails to achieve an important goal of sentencing in a white-collar crime prosecution: the need for general deterrence," and observing that "we are hard-pressed to see how a non-custodial sentence serves the goal of general deterrence"), cert. denied, 134 S. Ct. 140 (2013).

8

There remains a particularly strong need to deter individuals in the community who, like Perez, lead otherwise law-abiding lives but choose to engage in long-term, financially motivated fraud because they believe they can do so undetected. The Eleventh Circuit and other courts have also recognized that a defendant's positive employment history, especially in white-collar contexts, is not mitigating when that employment is what enabled the crime in the first place. *See, e.g., United States v. Whitehead*, 559 F.3d 918, 921 (9th Cir. 2009) (Gould, J., dissenting from denial of rehearing en banc) ("We can hardly be surprised if a white-collar criminal has a good employment history—otherwise, he or she would likely not be in a position to commit the crime.").

The Government also disagrees with the Defendant's assertion that a short custodial sentence combined with home detention, supervised release, and restitution would adequately deter this conduct. In an era where the monetary and cultural value of professional sports, and the memorabilia associated with it, continues to rise sharply, the industry has become increasingly vulnerable to insider theft and fraud, as several recent federal prosecutions have demonstrated

Moreover, Perez's background as a former law enforcement officer underscores the need for a strong deterrent sentence. Perez relied on his law-enforcement credentials to build a relationship with the Heat and ultimately to obtain employment with the organization. He then abused that trust by stealing from the very entity that relied on him for security and integrity. Although the "abuse of public trust" enhancement under U.S.S.G. § 3B1.3 does not apply to private-sector security personnel as outlined in *United States v. Ward*, Perez's conduct nonetheless represents a clear betrayal of trust that this Court may and should consider under § 3553(a) in fashioning a sentence that promotes general deterrence. 222 F.3d 909, 913 (11th Cir. 2000), A meaningful custodial sentence is essential to deter similarly situated individuals, particularly

9

former or current law enforcement officers, from abusing positions of employment to facilitate criminal conduct.

A sentence at the top of the advisory Guidelines range is both necessary and appropriate to send a clear message of deterrence to others who may be tempted to exploit positions of trust within professional sports organizations.

### D.  The need to avoid unwarranted disparities with similarly situated offenders:

A Guidelines sentence is also necessary to avoid unwarranted sentencing disparities with defendants who have committed crimes of similar scope and seriousness. In evaluating this factor, the Government respectfully directs the Court to several comparable federal cases:

- *United States v. Filippo Salvador Cuomo*, No. 18-CR-20348-MARTINEZ (S.D. Fla. 2019) (sentencing defendant to 46 months' imprisonment for stealing two watches valued at approximately $1.8 million and traveling to Miami to sell them).
- *United States v. Thomas Trotta*, No. 23-cr-127-MANNION (M.D. Pa. 2025) (following a plea to theft of major artwork, the defendant was sentenced to 96 months for theft of sports memorabilia, artwork, antiques, and other property; restitution ordered in the amount of $2,759,073).
- *United States v. Thomas Trotta*, No. 23-cr-149-MANNION (M.D. Pa. 2025) (following another plea to theft of major artwork, the defendant was sentenced to 108 months for theft of sports memorabilia, artwork, antiques, and other property; restitution ordered in the amount of $2,069,420).
- *United States v. Richard Brendan Globensky*, No. 24-cr-190-COLEMAN (N.D. Ill. 2025) (sentencing a former Augusta National Golf Course employee to 12 months and one day after granting a § 5K1.1 motion and after the defendant paid $1.5 million of $3.44 million in restitution).

Of particular note, Your Honor sentenced defendant Cuomo to 46 months in a case involving a loss amount similar to the loss here. However, the misconduct in this case is far more extensive, prolonged, and sophisticated than the conduct at issue in Cuomo. Moreover, as explained in greater detail below, the loss calculation in this case is lower than it should be because, at the time of the negotiated plea, the parties used the defendant's gain rather than the full appraised

10

value of the items sold and shipped across state lines. At that point, the Government had not yet completed its determination of the full inventory of stolen items or their values, and therefore the defendant received an inherent benefit at the Guidelines stage.

The *Globensky* case, though superficially similar, involved a defendant with a total offense level of 17, lower than the offense level here, and a Criminal History Category of I, resulting in an advisory range of 24 to 30 months. That defendant received cooperation credit at sentencing and paid $1.5 million in restitution prior to sentencing. The Government recommended 16 months, and the court imposed 12 months and one day. Given these notable distinctions, *Globensky* is informative but not sufficiently comparable to control the outcome here.

Accordingly, these cases reinforce that a sentence of 36 months is consistent with sentences imposed in cases of similar or greater complexity and financial harm.

The Defendant argues that data from the Judiciary Sentencing Information (JSIN) platform supports a below-Guidelines sentence, pointing to Paragraph 126 of the PSR and claiming that the average and median sentences for defendants with an offense level of 19 and Criminal History Category I are 22 and 24 months, respectively. On that basis, he contends that a downward variance is necessary to avoid unwarranted disparities.

The Defendant's reliance on JSIN data is misplaced. JSIN provides broad aggregated data that does not differentiate between cases involving victims and those involving victimless conduct, nor does it distinguish long-running, sophisticated schemes from isolated or low-complexity offenses. The platform also does not, and cannot, account for the critical aggravating factors present here: the Defendant's prolonged insider theft, his exploitation of a position of trust within the Heat organization, his systematic deception, and the enduring harm inflicted on the franchise through the loss of historically significant memorabilia that may never be recovered.

11

The sentencing data the Defendant cites simply does not capture these case-specific factors, nor does it reflect the qualitative considerations that routinely justify denying variances in more serious and impactful white-collar offenses. As such, the Defendant's reliance on JSIN is unpersuasive and does not justify a downward variance.

For all these reasons, a sentence of 36 months' imprisonment is consistent with sentences imposed in comparable cases and is necessary to avoid unwarranted sentencing disparities among similarly situated defendants, as required by 18 U.S.C. § 3553(a)(6).

### E. The Defendant's request for downward variance and/or departure are unwarranted.

The Defendant argues that a variance or departure down to 12 months and one day, including a period of home incarceration, is warranted for four primary reasons: (1) the alleged loss of his caretaking and financial support to his ill wife; (2) his age and personal health concerns; (3) his cooperation, lack of criminal history, and payment of restitution; and (4) his purported history of giving back to the community. None of these arguments supports the requested variance or departure.

First, the Defendant asserts that his wife's medical condition justifies a downward variance based on his role as her caretaker. However, Amendment 836, effective November 1, 2025, eliminated the departure language relating to specific personal characteristics previously found in §5H1.6 (Family Ties and Responsibilities). See USSG App. C, Amendment 836. The Defendant is therefore not entitled to a departure on that basis.

Even if the Defendant seeks to repackage this argument as a variance request, the standard in §5H1.6(B) still informs the analysis: a defendant must demonstrate that there are "no effective remedial or ameliorative programs reasonably available" and that the defendant's caretaking or financial support is "irreplaceable." §5H1.6(B)(iii). Courts interpret this as requiring that no

adequate substitute exists, whether another adult family member or other support resources. Here, the Defendant has not met that burden. His adult daughter and son-in-law, both attorneys residing in South Florida, are fully capable of assisting with any caretaking or financial needs. Thus, the Defendant is not irreplaceable, and this argument cannot justify the drastic variance he seeks.

Second, the Defendant argues that his age and health warrant leniency. Yet the Defendant was healthy enough between the ages of 57 and 62 to maintain employment with the Miami Heat and later the NBA, repeatedly access secure areas, steal high-value memorabilia, and operate an illicit business selling stolen goods across state lines. Having chosen to commit this scheme deep into retirement age, he cannot now rely on the age and health considerations that he chose to disregard throughout the entirety of his criminal conduct.

Third, the Defendant contends that his cooperation, lack of criminal history, and restitution efforts justify a reduced sentence. They do not. As to cooperation, the Government intends to file a Rule 35 motion once the Defendant's cooperation is complete, as is standard. A variance now would be premature and unwarranted. His lack of criminal history is already fully accounted for in the Guidelines through his Criminal History Category I, and thus cannot justify an additional variance.

With respect to restitution, the Guidelines make clear that a defendant's fulfillment of restitution obligations generally cannot serve as the basis for a departure except in extraordinary circumstances which are not present here. See U.S.S.G. §§ 5K2.0(d)(2), (5). The Defendant is merely repaying proceeds he still possessed at the time of arrest, and even then, only a fraction of the total restitution owed. These funds represent a small portion of the actual financial harm caused, and an even smaller portion of what the Miami Heat would need to expend to reacquire

13

the stolen items, many of which were sold overseas and include some of the most valuable jerseys involved in the scheme. The Defendant's efforts are not "extraordinary" by any standard.

Fourth, the Defendant's claims of community involvement, including uncorroborated statements about donations to the Red Cross and his church, are insufficient to justify a variance. His community-related activities stemming from his earlier police employment do not rise to the level of extraordinary or atypical service that would warrant a downward variance.

Finally, and critically, the Defendant has already received a substantial benefit from the plea agreement because the loss amount was calculated using "gain" under USSG §2B1.1, comment. n.3(B), rather than the appraised value of all stolen items. At the time of the information and guilty plea, the Government had not yet completed its investigation into the full inventory of stolen memorabilia, or the value of the items recovered from the Defendant's home. As such, loss could not yet be determined, and the parties reasonably relied on gain. This methodology produced a loss amount significantly lower than the actual or intended loss. The Defendant has therefore already received a meaningful reduction built into the Guidelines calculation. Any additional downward variance would result in a sentence below what is appropriate under §3553(a), particularly with respect to promoting respect for the law, providing just punishment, and deterring similar insider theft schemes.

### F.  Other requests

The Defendant also requests designation to a specific Bureau of Prisons facility. The Government has no objection to this request. However, he further asks the Court to grant him an indeterminate surrender date extending past his daughter's wedding and his wife's surgery in 2026. The Government objects. The Defendant has alternative lawful means to attend the wedding and

14

address family obligations, most notably, he may seek a furlough through the Bureau of Prisons. An open-ended or substantially delayed surrender date is not warranted.

## **CONCLUSION**

For the foregoing reasons, the Court should The Court should deny Defendant's motion for a downward variance and/or departure and impose Guidelines sentence of 36 months to recognize the damage inflicted by his fraud; and to accomplish the goals of sentencing set forth in 18 U.S.C. § 3553.

    Respectfully submitted,

    JASON REDING QUIÑONES
    UNITED STATES ATTORNEY

By:   */s/ Robert F. Moore*
    Robert F. Moore
    Assistant United States Attorney
    Court Id No. A5502488
    United States Attorney's Office
    99 NE 4th Street
    Miami, Florida 33132
    Tel: (305) 961-9411
    Email: Robert.Moore@usdoj.gov

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

By:   */s/ Robert F. Moore*
      Robert F. Moore