UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 25-CR-20346-JEM

UNITED STATES OF AMERICA,

Plaintiff,

vs.

MARCOS TOMAS PEREZ,

Defendant.

vs.

JASON SILVERSTEIN,

Petitioner/Claimant.
______________________________________/

**VERIFIED PETITION/CLAIM**
**OF PETITIONER/CLAIMANT JASON SILVERSTEIN**

Petitioner/Claimant, Jason Silverstein ("Mr. Silverstein"), hereby asserts, pursuant to Federal Rule of Criminal Procedure 32.2 and 21 U.S.C. Section 853(n) and (p), his legal interest in the property the Court has ordered forfeited pursuant to a Preliminary Order of Forfeiture of Subsequently Identified Assets, dated June 12, 2026 [ECF No. 79] (the "Forfeiture Order") and 18 U.S.C. § 982(a)(1), and as grounds therefore, Mr. Silverstein states:

**PROCEDURAL HISTORY**

1. On August 19, 2025, Defendant Marcos Tomas Perez pled guilty to a one count Information charging him with Transportation of Stolen Goods in violation of Title 18, United States Code § 2314.

2. On October 23, 2025, the Court entered a Preliminary Order of Forfeiture [ECF No. 25] forfeiting to the United States the assets listed in Defendant Perez's Plea Agreement.

3. On June 12, 2026, the United States filed a Motion for Final Order of Forfeiture of the assets in the Plea Agreement [ECF No. 76].

4. On the same day, June 12, 2026, the United States filed an Unopposed Motion for Preliminary Order of Forfeiture of Subsequently Identified Assets, [ECF No. 77]. Later that day, the Court entered the subject Forfeiture Order of the following property:

1. LeBron James 2011 Miami Heat NBA Finals Game-Worn Home Jersey, NBA Identification No. MHE00208;
2. LeBron James 2013 Sneakers from Ring Ceremony Player-Worn, 1 of 1 Nike Sneakers;
3. LeBron James 2013 NBA Finals Game Worn Jersey Game 7, NBA Identification No. MHE00910 (the "$3M jersey");
4. LeBron James 2012 Miami Heat Playoffs Game Worn Home Jersey;
5. LeBron James 2013 NBA Championship Ring Ceremony Jacket;
6. Shaquille O'Neal Red Game Worn Jersey, Inventory No. 2311;
7. Shaquille O'Neal Black Game Worn Jersey, Inventory No. 2317;
8. Jimmy Butler White Game Worn Jersey, Inventory No. 2337;
9. Dwyane Wade Red Game Worn Jersey, Inventory No. 2354;
10. Shaquille O'Neal Black Game Worn Jersey, Inventory No. 2363;
11. Jimmy Butler White Game Worn Jersey, Inventory No. 2371;
12. Jimmy Butler Black Playoffs Game Worn Jersey, Inventory No. 2379;
13. Shaquille O'Neal White Game Worn Jersey, Inventory No. 2405;
14. Dwyane Wade White Playoffs Game Worn Jersey, Inventory No. 2408;
15. Chris Bosh Jersey, NBA Identification No. MHE01263;
16. Dwyane Wade Jersey, NBA Identification No. MHE00770; and
17. Shaquille O'Neal Jersey Number 32, Jersey Size 62, with a 2004-2005 tag.

Mr. Silverstein hereby asserts his legal interest over all of the aforementioned items, with the exception of the LeBron James 2013 NBA Championship Ring Ceremony Jacket (Item #5), which Mr. Silverstein never owned (the "At Issue Items"). Below is a chart showing the circumstances of Mr. Silverstein's acquisitions:

| **No.** | **Description of At Issue Items** | **Circumstances of Purchase** |
|---|---|---|
| 1 | LeBron James 2011 Miami Heat NBA Finals Game-Worn Home Jersey, NBA Identification No. MHE00208 | Mr. Silverstein purchased Item #1 in March 2022 through a third-party broker. Item #1 was sent to MeiGray for authentication. |

| | | |
|---|---|---|
| 2 | LeBron James 2013 Ring Ceremony Player-Worn 1 of 1 Nike Sneakers | by Mr. Silverstein purchased Item #2 from a third-party collector in November 2021 who has no connection to Mr. Perez. |
| 3 | LeBron James 2013 NBA Finals Game 7 Game-Worn Jersey, NBA Identification No. MHE00910 (the "3M Jersey") | Mr. Silverstein purchased Item #3 in August 2021 from a third-party. The transaction was formally documented in a Sale and Purchase Agreement.<br><br>In or about January 2023, Mr. Silverstein sold Item #3 at a Sotheby's auction. Prior to the auction, and at Mr. Silverstein's suggestion, Sotheby's conducted due diligence on Item #3, including but not limited to contacting Mr. James and confirming that he approved the sale. |
| 4 | LeBron James 2012 Miami Heat Playoffs Game-Worn Home Jersey | Mr. Silverstein purchased Item #4 in August 2021 through a third-party broker. The transaction was formally documented in a Sale and Purchase Agreement and included a law firm as an escrow agent. This transaction predated Mr. Silverstein even knowing of Mr. Perez's existence. |
| 5 | LeBron James 2013 NBA Championship Ring Ceremony Jacket | Mr. Silverstein makes no claim to Item #5. |
| 6 | Shaquille O'Neal Red Game-Worn Jersey, Inventory No. 2311 | Mr. Silverstein purchased Item #6 from Mr. Perez in December 2023. Mr. Perez represented that he was acting as middleman arranging the sale of Item #6 for the actual owner of the item. Mr. Perez provided a certificate of authenticity from Resolution Photomatching. |
| 7 | Shaquille O'Neal Black Game-Worn Jersey, Inventory No. 2317 | Mr. Silverstein purchased Item #7 from Mr. Perez in November 2023 after it was authenticated by Resolution Photomatching. |
| 8 | Jimmy Butler White Game-Worn Jersey, Inventory No. 2337 | Mr. Silverstein purchased Item # 8 from Mr. Perez in October 2023 after Mr. Perez produced a certificate of authenticity from Resolution Photomatching. |
| 9 | Dwyane Wade Red Game-Worn Jersey, Inventory No. 2354 | Mr. Silverstein purchased Item #9 from Mr. Perez in October 2023. Item #9 received authentication from Resolution Photomatching. |

| | | |
|---|---|---|
| 10 | Shaquille O'Neal Black Game-Worn Jersey, Inventory No. 2363 | Mr. Silverstein purchased Item #10 in November 2023. Mr. Perez represented that he was acting as middleman arranging the sale of Item #10 for the actual owner of the item. Item #10 received authentication from Resolution Photomatching. |
| 11 | Jimmy Butler White Game-Worn Jersey, Inventory No. 2371 | Mr. Silverstein purchased Item #11 from Mr. Perez in December 2023 after Mr. Perez produced a certificate of authenticity from Resolution Photomatching. |
| 12 | Jimmy Butler Black Playoffs Game-Worn Jersey, Inventory No. 2379 | Mr. Silverstein purchased Item #12 from Mr. Perez in March 2024. |
| 13 | Shaquille O'Neal White Game-Worn Jersey, Inventory No. 2405 | Mr. Silverstein purchased Item #13 from Mr. Perez in June 2024 after Mr. Perez produced a certificate of authenticity from Resolution Photomatching. |
| 14 | Dwyane Wade White Playoffs Game-Worn Jersey, Inventory No. 2408 | Mr. Silverstein purchased Item #14 from Mr. Perez in April 2022. |
| 15 | Chris Bosh Jersey, NBA Identification No. MHE01263 | Mr. Silverstein purchased Item #15 in August 2021 from a third-party. The transaction was formally documented in a Sale and Purchase Agreement and included a law firm as an escrow agent. This transaction predated Mr. Silverstein even knowing of Mr. Perez's existence. |
| 16 | Dwyane Wade Jersey, NBA Identification No. MHE00770 | Mr. Silverstein purchased Item #16 in August 2021 from a third-party. The transaction was formally documented in a Sale and Purchase Agreement and included a law firm as an escrow agent. This transaction predated Mr. Silverstein even knowing of Mr. Perez's existence. |
| 17 | Shaquille O'Neal Jersey No. 32, Size 62, with a 2004–2005 Tag | Mr. Silverstein purchased Item #17 in August 2021 from a third-party. The transaction was formally documented in a Sale and Purchase Agreement and included a law firm as an escrow agent. This transaction predated Mr. Silverstein even knowing of Mr. Perez's existence. |

## LEGAL STANDARD

As a threshold matter, the distinction between civil and criminal forfeiture is critical here. Unlike civil forfeiture, which is an *in rem* action against the property itself, criminal forfeiture is an *in personam* action in which only the defendant's interest in the property may be forfeited—not the interest of an innocent third party. *See* Rule 32.2(b) of the Federal Rules of Criminal Procedure. While 21 U.S.C. §853 incorporates certain aspects of *in rem* proceedings against property tainted by the defendant's criminal conduct, *see United States v. Daugerdas*, 892 F.3d 545, 548 (2nd Cir. 2018), these provisions were never intended to dispossess innocent purchasers of legitimately acquired property. To the contrary, it was the express intent of Congress "to recover all of [defendant's] ill-gotten gains but not to seize legitimately acquired property." *See id.* (quoting *United States v. Porcelli*, 865 F.2d 1352, 1365 (2d Cir. 1989) (emphasis added)).

While the Government's interest in forfeited property "relates back" to the commission of the act giving rise to forfeiture, 21 U.S.C. § 853(c), the Eleventh Circuit has explained that Congress included the relation-back provision "specifically … as a way of avoiding" post-crime transfers designed to place property beyond the Government's reach—for example, where a defendant attempts to defeat forfeiture by gifting property to a family member. *United States v. Kennedy*, 201 F.3d 1324, 1335 (11th Cir. 2000). Thus, the relation-back doctrine was aimed at sham transactions and collusive transfers—not arm's-length purchases by innocent buyers who paid full value in good faith. 21 U.S.C. § 853(n)(6)(B) sets forth the "bona fide purchaser" (BFP) exception in federal criminal forfeiture cases, which allows a third party to petition a court to recover property from a government forfeiture order by proving they have a legal interest, paid full value, and acquired the asset without reasonable cause to know it was subject to forfeiture. *See Kennedy*, 201 F.3d at 1329. Specifically, the provision safeguards "persons who [gave] value to

the defendant in an arm's-length transaction with the expectation that they would receive equivalent value in return." *United States v. Soreide*, 461 F.3d 1351, 1356 (11th Cir. 2006).

The law and facts of this case overwhelmingly establish Mr. Silverstein's exclusive interest in the At Issue Items as a bona fide purchaser for value. Mr. Silverstein paid fair market value for each item, conducted himself in a manner wholly consistent with legitimate industry practice, and had absolutely no reason to suspect—nor could he have reasonably suspected—that the items he purchased were connected to any criminal activity. The Government cannot overcome these facts, and the forfeiture of Mr. Silverstein's lawfully acquired property would be both legally unjustified and fundamentally inequitable.

**BACKGROUND AND FACTUAL HISTORY**

5. As detailed herein, Mr. Silverstein reasonably and in good faith believed that Defendant Perez was authorized to sell the At Issue Items that were sold by Mr. Perez. Indeed, Mr. Silverstein had no actual or constructive knowledge, nor any reason to suspect, that the items were stolen or otherwise obtained under suspicious circumstances. To the contrary, Mr. Perez, a former law enforcement officer, was a security professional and trusted employee of the Miami Heat (and later the NBA). Mr. Silverstein had every legal right to rely on Mr. Perez's position, authority, and course of conduct to reasonably believe that Mr. Perez was authorized to engage in these transactions. Significantly, several of the At Issue Items were purchased by Mr. Silverstein *not from Mr. Perez*, but from a third-party who has never been accused of any wrongdoing.

6. By way of background, Mr. Silverstein has maintained a longstanding interest in collecting sports memorabilia. What began as a childhood passion evolved into a lifelong pursuit, during which he devoted years to developing an extensive knowledge of the history, evolution, and marketplace for sports memorabilia over the past quarter century. Mr. Silverstein is also

among the most prolific purchasers of memorabilia sold directly by the NBA. Beyond his personal collection, he has worked to promote the growth, accessibility, and legitimacy of the sports memorabilia market, reflecting a commitment that extends well beyond collecting. His longstanding involvement in the hobby underscores that his participation has consistently been open, transparent, and rooted in a genuine enthusiasm for the field.

7. Mr. Silverstein has also consigned and sold sports memorabilia through reputable auction houses that conduct independent due diligence and require appropriate representations and warranties confirming that consigned items are neither stolen nor the subject of any ownership dispute. In short, Mr. Silverstein is a respected and longstanding collector whose reputation has been built on conducting transactions openly, lawfully, and in good faith. His commitment to the hobby extends beyond the acquisition of memorabilia; he places significant value on the trust, integrity, and lasting relationships fostered within the collecting community.

**Gifting and Selling Sports Memorabilia: Industry Standards**

8. Professional sports teams in the United States have a longstanding and well-documented practice of authorizing equipment managers, ball boys, athletic trainers, security personnel and other team employees to retain, receive and/or sell team-issued apparel and equipment including, but not limited to, game-worn jerseys, shorts, sneakers, and warm-up jackets and other memorabilia. Historically, at the conclusion of each season, teams would frequently distribute such items to longtime staff as a form of recognition or bonus, particularly to make room for new equipment and apparel for the upcoming season. This practice became commonplace during a period when game-worn memorabilia possessed little commercial or collectible value.

9. Similarly, at the conclusion of each season, some teams would offer players the opportunity to retain game-worn apparel and equipment. Some players declined to do so. Further,

there were many instances in which teams and players would discard game-worn items in the trash. In these instances, game-worn jerseys, sneakers, wristbands, and other items were often left with or gifted to team personnel, particularly where longstanding relationships had developed between players and staff members.

10. It was also common for individuals affiliated with professional sports teams who had lawfully acquired such items through team practices or player gifts to sell game-used memorabilia to the public. In the memorabilia industry, these items were frequently described as originating from a "Team Source," a term commonly understood to denote that the memorabilia had been obtained from a person affiliated with the team rather than directly from the player.

11. Sports teams and players have been aware of this industry-wide reality for ***decades*** and, until recently, have never raised any issues or objections to the practice. Most players and teams, with a few exceptions known to the collecting community, have allowed the free use, sale and trade of game-worn items.

12. Against this historical backdrop, Mr. Silverstein's manner of building his collection is entirely consistent with longstanding practices within the sports memorabilia industry. Indeed, other prominent collectors have acquired game worn memorabilia from equipment managers, ball boys and other individuals affiliated with professional sports organizations. Likewise, significant collections donated to various institutions have included memorabilia acquired through these customary channels. The manner in which Mr. Silverstein acquired game-worn items, including those obtained from Mr. Perez, is materially indistinguishable from the acquisition practices long employed by league retail partners and other recognized participants in the sports memorabilia industry.

13. Only recently have *some* teams and leagues begun to exert new and stringent controls over game-worn items, instituting internal tracking, inventory systems, and licensing requirements (*e.g.*, the NBA's former partnership with MeiGray, a well-known and highly regarded sports memorabilia authentication and marketing company specializing in game-worn items, and its current partnership with Sotheby's).

14. For example, in late June 2026, approximately 30 minutes before an auction was scheduled to begin, Sotheby's withdrew from sale the basketball connected with OG Anunoby's game-winning tip-in at the conclusion of Game 4 of the 2026 NBA Finals following an ownership objection reportedly asserted on behalf of the New York Knicks. It has likewise been reported that the Knicks objected to Sotheby's offering jerseys and other memorabilia from Games 2 and 3 of the 2026 NBA Finals. These events reflect the modern evolution of the sports memorabilia marketplace, in which professional teams increasingly exercise ownership claims and control over game-used memorabilia. By contrast, during the period relevant to Mr. Silverstein's acquisitions—and particularly within the Miami Heat organization—such centralized control over game-worn memorabilia did not exist, and game-used items routinely entered the marketplace through team personnel, players, and other customary channels without any objection.

15. As the market for game-worn memorabilia has evolved into a multi-billion-dollar industry, professional sports teams have increasingly come to view game-used memorabilia as valuable assets rather than disposable equipment. Much of this increase in value has been driven by the advent of sophisticated photo-matching technology, which can authenticate and identify the precise game or games in which a particular item was worn. As a result, jerseys and other equipment that were once routinely discarded, gifted, or distributed without any meaningful

perceived value can now command substantial prices in the memorabilia marketplace because they can be conclusively linked to significant players, games, or historic moments.

**<u>Miami Heat Protocols and Procedures (or Lack Thereof)</u>**

16. The Miami Heat was known as an organization that implicitly authorized the free flow of its game-worn items. The Heat ballboys were well-known for selling game worn items via various channels and online platforms. Players also frequently showed appreciation to staff by gifting game-worn gear and making public shout-outs.

17. Rob Pimental, the head equipment manager for the Miami Heat, is notorious for gifting and selling an extraordinary volume of memorabilia, a practice dating back to his time with the Sacramento Kings. Notably, the only other person besides Mr. Pimental listed on the Miami Heat website as equipment staff is Marvin Ulyssee. Mr. Ulyssee has openly sold game-used objects from the Heat locker room for over fifteen years and is a well-known seller amongst game-worn collectors.

18. There are countless examples of Heat employees possessing game-worn items without objection. For example, Matt Dodson, an assistant equipment manager for the Heat, sold game-worn Lebron James and Dwyane Wade jerseys, along with certificates of authenticity stating that he acquired the items in his time as a team employee. *See* Exhibit 1.

19. By way of further example, Robert Charles Holmquist, a Heat employee from 2013 to 2016, signed a letter on July 17, 2024 in support of selling a game-worn Dwyane Wade jersey, indicating that he had been gifted the jersey "in recognition of [his] dedication and service and [his] relationship with various players." *See* Exhibit 2.

20. The practice of gifting game-worn items to team equipment managers, including team employees, has not been limited to the Heat. *See* Exhibit 3 (auction listings for two of the

most high-profile players in NBA history – Kawhi Leonard and Kevin Durant – posted by team employees).

21. Historically, the Miami Heat and its players consented to the sale of game-worn items on the open market as collectibles or memorabilia. Indeed, the Heat affirmatively chose not to utilize any third-party authenticator for their property for years. It is undisputed that MeiGray – the NBA's official authenticator – presented proposals to the Heat on multiple occasions in the early 2010's to maintain inventory records and track all game-worn jerseys. The Heat declined to engage the services of MeiGray at that time.

22. Because of the Heat's consent to the sale of game-worn items on the open market and decision not to work with MeiGray, hundreds, if not thousands, of game-worn Heat items have been sold, including many quite publicly. Not a single person connected to the Heat ever objected to these sales. *See* Exhibit 4 (listing examples of just a handful of the high-profile Heat jerseys sold with no objection from the organization).

23. The Salvation Army even sold at least one Dwyane Wade game-worn jersey, further demonstrating the lack of Heat protocols surrounding game-word items. *See* Exhibit 5.

24. Heat players also frequently gifted jerseys to friends and family, and those items have appeared on the internet or at auction houses for sale. *See* Exhibit 6 (items gifted by Lebron James to teammates of his during high school and later sold on the open market).

25. In the face of these high-profile sales, the Heat has never sent cease-and-desist letters or asserted legal claims. There both was and is no reason for any collector to believe the Miami Heat objected to the sale of game-worn items.

26. Only recently has the Heat decided to more closely oversee and monitor game-worn items, partnering with the Realest as their authentication partner in or about late 2024. The Realest

ensures that game-worn memorabilia is properly identified, authenticated and stored. Recently, the Realest took to Instagram to demonstrate its authentication process for the basketball used in Bam Adebayo's 83-point game, illustrating the seismic shift in the Heat's oversight and internal controls. *See* Exhibit 7.[1]

**<u>Mr. Silverstein's Business Dealings with Perez</u>**

27. From the inception of their interactions, Mr. Perez introduced himself to Mr. Silverstein as a Senior Security Official with the Heat and NBA, and a former long-time member of the Miami Dade Police Department. Mr. Perez even sent Mr. Silverstein a photograph of his police sergeant's badge. *See* Exhibit 8. Mr. Perez publicly documented his time with the police force on social media and used his LinkedIn profile to represent to the public that he was a Security Representative for the NBA. *See* Exhibit 9. Mr. Perez even publicly congratulated players on behalf of the Miami Police Department. *See* Exhibit 10.

28. Mr. Silverstein rightly viewed Mr. Perez's position as a highly respected police officer and trusted Security Officer for the Heat (and later the NBA) as evidence that Mr. Perez would conduct legitimate business.

29. Mr. Perez regularly boasted—both privately to Mr. Silverstein and publicly—about his relationships with Miami Heat players, posting and sending images of himself in a police uniform or wearing a suit with NBA credentials on the court with celebrities and Heat players. *See* Exhibit 11. Mr. Perez also boasted about his relationships with NBA players from other teams, including Kyle Kuzma and John Wall. *See* Exhibit 12.

---

[1] Critically, on average, auction prices at the Realest come in lower than what Mr. Perez charged for his memorabilia, further legitimizing Mr. Perez's transactions and demonstrating that Mr. Silverstein paid fair market value.

30. Mr. Perez frequently communicated with Mr. Silverstein about his relationships with the Heat and NBA more broadly. Correspondence between Mr. Perez and Mr. Silverstein confirms the legitimacy of Mr. Perez's business dealings. For *example*:

- Mr. Perez sent Mr. Silverstein photographs of personally inscribed autographed memorabilia, including (i) "I'm glad I got that rebound. Thanks for all you do – Chris Bosh," and (ii) "It's been some amazing moments over the last decade plus. Continue to inspire the community. – Dwyane Wade". *See* Exhibit 13.

- Mr. Perez sent Mr. Silverstein photographs of the NBA championship ring he was given by the team. *See* Exhibit 14.

- Mr. Perez sent Mr. Silverstein security video footage of Mr. Perez taking game worn jerseys and other items back to the locker room to get them signed by the players, including a Bam Adabayo jersey.

- Mr. Perez gave Mr. Silverstein his NBA business card showing he was a high-ranking security official in the NBA (and Mr. Silverstein would have no reason to believe that an individual vetted by the NBA would be acting unlawfully). *See* Exhibit 15.

- Mr. Perez possessed and relayed information to Mr. Silverstein about game worn items, including how long jerseys were in use, whether certain jerseys remain in the "rotation," explaining the "routine" with respect to how players would wear their jerseys and sneakers, and what certain players preferences were. *See* Exhibit 16.

- Mr. Perez sent Mr. Silverstein inventory sheets similar to what an equipment manager would create, as it included many of the lesser-known players on the team. *See* Exhibit 17.

- Mr. Perez told Mr. Silverstein that he bid on jerseys and sneakers at auctions, including paying over $30,000 for a Jimmy Butler jersey, thereby confirming he was a legitimate collector. *See* Exhibit 18.

31. Notably, most of the memorabilia Mr. Perez sold to Mr. Silverstein was authenticated by Resolution Photomatching. To Mr. Silverstein's knowledge, none of the memorabilia that Mr. Perez sold and that was provided to Resolution Photomatching was ever identified as stolen or flagged as having a questionable chain of ownership. Individuals buying or selling stolen sports memorabilia are unlikely to use authentication services like Resolution.

32. In addition to the above indicia of legitimacy, Mr. Perez's public-facing conduct was also entirely consistent with his lawful ownership of memorabilia, including:

- Publicly discussing memorabilia and offering memorabilia for sale ***for years*** on social media through his public Instagram account, followed by over 400 collectors who actively and openly engaged with Mr. Perez. Mr. Perez's Instagram account was not private, and he boasted that he was "Mr. Miami Heat" to collectors. His Instagram account featured the official NBA logo and stated "The best in game used merchandise. Every item is photomatched for your personal guarantee." *See* Exhibit 19.

- Publicly displaying his extensive collection of game used memorabilia. *See* Exhibit 20.

- Using a photo of himself with memorabilia as his twitter profile picture. *See* Exhibit 21.

33. Indeed, Mr. Perez's public Instagram account, miamiheat1988gameused, routinely featured items of sports memorabilia in his possession from the Heat and from other teams as well, including autographed items. These postings supported Mr. Silverstein's good faith belief that Mr. Perez was a legitimate actor. In other words, he behaved in the opposite way that someone who was selling stolen merchandise would.

34. Mr. Perez's private communications with Mr. Silverstein, and Mr. Perez's public-facing conduct, lead to only one conclusion: that Mr. Silverstein obtained possession of the At Issue Items legitimately, legally and in good faith, and without any actual or constructive knowledge, nor any reason to suspect, that the items were stolen or otherwise obtained under suspicious circumstances.

**<u>Perez's Volume of Memorabilia was Normal and Expected</u>**

35. Far from raising suspicion, the sheer volume of memorabilia possessed and sold by Mr. Perez reinforced the legitimacy of his activities. No reasonable collector would believe that such a large-scale and longstanding operation could exist without the knowledge, consent, or acquiescence of the Heat.

36. Equipment managers are required to keep track of team gear. It is therefore *impossible* that the Heat equipment manager, Rob Pimental, would not know if a large volume of jerseys and sneakers were stolen. In other words, Mr. Perez's activities appeared to have the stamp of approval of the Heat.

37. Additionally, the knowledge and information conveyed by Mr. Perez led Mr. Silverstein to believe that Mr. Perez was acting with the equipment staff of the Miami Heat in the sale of the property. For example, Mr. Perez had detailed information that only an equipment manager (or a person connected to the equipment manager) would have, including how long jerseys were in use, whether certain jerseys remain in the "rotation," and what certain players' preferences were. *See* Exhibit 22.

38. Mr. Pimental, a former Sacramento Kings equipment manager, was known for selling massive quantities of Sacramento Kings game-worn memorabilia. eBay was flooded with memorabilia when he was the Kings' equipment manager. This is not a red flag to collectors, as equipment managers have historically been the source for game-worn material on market. *See* supra ¶¶ 8-15.

39. Significantly, many of the items possessed by Mr. Perez were not even game-worn items. Rather, many of the items were those of bench players or simply extra jerseys, shorts or warm up shirts, which had little to no value. Mr. Perez's possession of such items is further evidence that he legitimately obtained his collection, including as an equipment dump from the Heat.

40. Mr. Perez was also an active seller with at least one major auction house and also sold via online platforms. Mr. Silverstein is unaware of any of these other companies that engaged with Mr. Perez taking issue with him or how he obtained his items.

**<u>Prices Paid for the At Issue Items</u>**

41. The prices Mr. Silverstein paid for the At Issue Items further demonstrate the legitimacy of his transactions with Mr. Perez.

42. Mr. Silverstein paid Mr. Perez ***a premium***, well above the amounts Mr. Perez could have obtained by consigning the items to auction houses. Mr. Silverstein did this because he believed in the transparency and legitimacy of the source of the At Issue Items. Stated differently, Mr. Silverstein paid ***more*** than the market would bear at that time because of who Mr. Perez was (i.e., a legitimate source for game worn memorabilia).

43. In fact, Mr. Perez would obtain estimates from auction houses and Resolution Photomatching, such that he understood the market value of the items he was selling, including to Mr. Silverstein.

44. Mr. Perez often turned down large amounts of money offered by Mr. Silverstein and other collectors for certain items, reinforcing the *legitimacy* of Mr. Perez as a seller and collector, as opposed to a thief seeking to dump items for cash as quickly as possible.

**<u>INTEREST IN AT ISSUE ITEMS</u>**

For the reasons set forth above, and the evidence included herein, Mr. Silverstein declares that he has valid, good faith, and legally recognizable interest in the At Issue Items. The following facts, taken together, demonstrate that Mr. Silverstein acquired every At Issue Item as a bona fide purchaser for value, with no knowledge or reason to believe that the items were connected to any criminal activity.

<u>First</u>, Mr. Silverstein did not even purchase several of At Issue Items from Mr. Perez: he purchased them from a different third party that has never been accused of any wrongdoing. In fact, at least one of the items has no connection whatsoever to Mr. Perez and is merely a Heat

game-worn item that Sotheby's possessed. This led the Government to erroneously treat the item as connected to Mr. Perez. Indeed, Mr. Silverstein acquired several of the At Issue Items ***before he was even aware of Mr. Perez's existence***. Because Mr. Silverstein never obtained these items from or through Mr. Perez, the items bear no nexus to the criminal conduct underlying the Forfeiture Order and should not be subject to forfeiture.

Second, Mr. Silverstein conducted each transaction for the At Issue Items at arm's length, following genuine commercial negotiations. Mr. Silverstein and the sellers engaged in back-and-forth price discussions, with offers made, countered, and sometimes rejected over the course of weeks or months. These were not hurried or below-market transactions characteristic of stolen property; rather, they reflected the deliberate negotiations of willing buyers and sellers operating in the legitimate sports memorabilia marketplace.

Third, Mr. Silverstein memorialized many of his purchases in written contracts, including formal Sale and Purchase Agreements with identified sellers, purchasers, and attorneys acting as escrow agents. The use of written agreements, attorney-administered escrow arrangements, and formal documentation further underscores the legitimacy and transparency of these transactions. Mr. Silverstein consistently agreed to formally document these transactions, reflecting his good faith belief that he was engaging in lawful commerce.

Fourth, several of the At Issue Items were subsequently provided to a reputable, high-profile auction house—Sotheby's—including one item that resulted in a widely publicized sale attracting significant media attention. These auction houses conducted their own independent due diligence before accepting the items for consignment. In at least one instance, Sotheby's directly contacted the relevant professional athlete and obtained approval to proceed with the sale. The fact

that these items were offered, vetted, and sold through legitimate public channels without objection from the Miami Heat or the NBA further validates Mr. Silverstein's ownership interest.

Fifth, a majority of the At Issue Items Mr. Silverstein purchased were authenticated by industry-leading authentication services, including Resolution Photomatching. That Mr. Perez and other sellers sent items for authentication demonstrates the legitimacy of the process, as opposed to individuals trying to hide ownership and quietly sell memorabilia.

Sixth, the prices Mr. Silverstein paid for the At Issue Items further confirm the legitimacy of his transactions. Mr. Silverstein consistently paid a premium—often well above what the seller could have obtained through auction consignment—because he believed in the transparency and legitimacy of the source. These above-market prices are wholly inconsistent with the purchase of stolen goods.

## CONCLUSION

For each of the foregoing At Issue Items, the evidence establishes that Mr. Silverstein paid valuable consideration, acquired the item through legitimate commercial transactions, and had no knowledge or reason to believe the item was subject to forfeiture or connected to any criminal conduct. As such, Mr. Silverstein qualifies as a bona fide purchaser for value under 21 U.S.C. 853(n)(6)(B).

## VERIFICATION

I attest and declare under penalty of perjury that my claim to this property is not frivolous and that the information provided in support of my claim is true and correct, to the best of my knowledge and belief.

Executed on this 23rd day of July, 2026.

________________________
Jason Silverstein

Respectfully Submitted,

*/s/ Michael D. Padula*
Michael D. Padula, Esq.
Florida Bar No. 314810
**PADULA LAW FIRM PLLC**
Courvoisier Centre II
601 Brickell Key Drive, Suite 700
Miami, Florida 33131
Tel: (305) 455-5206
Email: mpadula@padulalawfirm.com
fgonzalez@padulalawfirm.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed via the Court's CMC/ECF system and a copy of the foregoing was furnished to all counsel of record electronically via the Courts CMC/ECF system this 23rd day of July, 2026.

By: */s/ Michael D. Padula*
Michael D. Padula